\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF VIRGINIA

FOURTH DIVISION

January 14, 2015

CLERK'S OFFICE U.S. DIST. COURT
AT HARRISONBURG, VA
FILED

JAN 1 4 2015

JULI~ ~ ~~~Y, CLERK
BY: _____
DEPUTY CLERK

KRIESTA L. WATSON, pros se )
     Plaintiff(s), )
     )
v.      )     Civil Action No. 5:14cv00022
     )
SHENANDOAH UNIVERSITY, ET AL, )
     Defendant(s), )

*Tracey FitzSimmons*
*Marie Landes*
*Byron Grigsby*
*Calvin Allen*
*Board of Trustees*

MOTION TO AMEND COMPLAINT

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Plaintiff, Dr. Kriesta Watson, hereby request this honorable Court to amend her complaint pursuant to Fed. R. Civ. Proc. 15(a)(2)and  because Plaintiff is a pro se litigant.

Dr. Kriesta Watson, as plaintiff to this action, and as grounds therefore avers as follows:

This lawsuit was filed on May, 2014, against Shenandoah University for violation of public policy Federal Statutes (see Title *29 CFR 541.602 - Salary basis and 29 U.S. Code § 218c, Title VII of the Civil Rights Act of 1964* or violations of protected classes of

race, gender, and discrimination, *42 U.S.C. 2000e et seq., and Labor Laws*, and Violation of Fourteenth Amendment Rights,  Lack of Due Process, 42 U.S.C. § 1983).

Under Title VII of the Civil Rights Act of 1964, the **Defendants** violated the public policy by using race, gender, and disability discrimination against **Dr. Kriesta L. Watson, The Plaintiff,** a motivating reason for her discharge on October 25, 2010 and causing harm to her.

The following allegations are included below:

**Race Discrimination**

Incident A

In July 2010, The Plaintiff received poor evaluations that were  negatively assessed then she wrote a formal responses to address the negative review comments (August 2010). Yet, during the evaluation, the Plaintiff was not provided the opportunity to address Dr. Grigsby's one-sided evaluation. In addition, it was not an "opportunity for the employee to express to the supervisor any concerns the employee might have" (SU Staff Handbook, 2009, p. 44). Instead, it was used as an opportunity to create a hostile work environment in which Dr. Grisgby did not advocate or mentor. However, to date, the Defendant, Dr. Grigsby, a white male, never addressed the review comments using due process.

Additionally, when the Plaintiff questioned his erroneous conclusions regarding her work schedule, she was told to "sit there and take it." The Plaintiff kept extensive journals of the abuse undertook by Dr. Grigsby during his one on one meetings.

Repeatedly, the Plaintiff had numerous incidents where he was verbally abusive and sought internal counsel regarding the matter with university members. The stated evaluation was circulated to selected university members to solicit their opinion and it raised major concern regarding the professional integrity of the document. The Plaintiff

was advised to respond in writing asking for clarification. (see Exhibit ___: Performance Evaluation Narrative, Email dated 8/17/10).

To date, the Plaintiff has not been provided the specific incidents regarding the evaluations written in 2009 and 2010. Yet, Dr. Grigsby continued to maintain that there were incidents; of which the Plaintiff never received dates, times, and specific details (See Exhibit ___: Email dated Email dated 8/17/10 @ 4:18 pm and 1:47 pm). Please note that a 16-page narrative was submitted before the Performance Evaluation that was completed dismissed within the review conversation and final evaluation document (Exhibit ___: Performance Evaluation Narrative, Email dated 8/17/10 @ 4:18 pm and 1:47 pm). Additionally, documents were provided to EEOC that the Plaintiff never reviewed; yet, these documents were used in the final termination decision. Due process was violated in the act of final termination.

Therefore, Defendant violated the Plaintiff's due process. Most importantly, this review was used as evidence and grounds for the final termination in October 2010. **(See Exhibit 1: Termination Letter dated October 25, 2010)**

Dr. Watson provided evidence disputing the negative review. However, the Supervisor, Dr. Grigsby, never provided a response addressing the 16 page narrative response sent to him regarding his review nor was a meeting called to address an appropriate, equitable, performance review. Instead, the negative review was allowed to stand on record and used later in the final termination. **(See Exhibit 1: Termination Letter dated October 25, 2010)**

However, when Dr. Watson spoke with other executive level Administrators (Dr. McKay, Dr. Allen, and Dr. Morton) regarding this incident, she was told to write a formal response citing the specific negative comments on the review that needed to be addressed. Today, this review has never been corrected nor was the 16 page narrative addressed with an appropriate supervisor response and with the appropriate internal due process. Particularly, the major challenge with the review is that it did not address any work accommodations for her immediate disabilities caused by the motor vehicle accident.

Consequently, the university did not provide *any* accommodations for any immediate disabilities once she returned to work and used missed days at work due to doctor visits and work performance challenges (result of immediate disabilities) as evidence for a negative performance evaluation resulting eventually in termination in October, 2010. (See Exhibit 1: Termination Letter dated October 25, 2010;  Exhibit ___: Performance Evaluation, 2009 and 2010; Email dated 8/17/10 @ 4:18 pm and 1:47 pm, Grievence Letter sent December 20, 2010) In a letter dated December, 2010 to Dr. Fitzsimmons, the Plaintiff noted that Dr. Grigsby did not advocate for her given medical challenges nor were accommodations made regarding work schedule and other related matter in accordance with ADA Title I / FMLA.

When the Plaintiff inquired about the allegations of missed days at work, no response was given nor were dates cited.  (See email dated 8/17/10 @ 4:18 pm). Additionally, other white employees on her team were granted accommodations for disability without conflict or challenge (i.e., Andrea Schmahl, Former Registrar (Bill), Teresa Masiello, Registrar Assistant (Nicole Niccole Gatliff)).


Incident B

On October 20 at 4:15 PM, Dr. Watson received a call from Dr. Grigsby' secretary inquiring that she should come to his office immediately to discuss the previous days' concerns. The Plaintiff did not feel comfortable having another one to one meeting where he could state abusive comments and act unprofessionally. At the moment of the call, Dr. Watson was in a meeting with Dr. Morton who advised her at that time that Dr. Grigsby was on an aggressive witch hunt to get her fired from the University. Dr. Morton also stated that his behavior was racially motivated. **(See Exhibit ___: Email dated 10/21/2010)**

When Dr. Watson received the call in Dr. Morton's office, Dr. Grigsby began to threaten her as well as made commented that he was going to ensure that she would be fired, leading to verbal assaults. Dr. Grigsby became more aggressive and angered.

Since Dr. Watson was in Dr. Morton's office, there was no need to be angry and respond in-kind.

During Dr. Watson's tenure at the University, she was constantly told by her staff, other Administrators, and faculty members that she needed to be cautious of the fact that the universe was a racist institution given its status as a Predominantly White Institution (PWI). Particularly, conversations with Dr. Teresa and Dr. Morton underscored and highlighted these concerns.

Incident C

In Summer  2010 (June 28, 2010), Dr. Watson was requested by the President Dr. Fitzsimmons to provide her an assessment of Dr. Grigsby's perception survey instrument for his annual yearly review. Dr. Watson delivered the results along with the appropriate details as the information was private and confidential. At this time, the data assessment did not present Dr. Grigsby in a positive light and cast doubt about his effective role as senior level administrator. There were negative comments regarding his abusive behaviors, lack of communication, and poor management skills. After Dr. Watson gave Dr. Fitzsimmons the results, Dr. Watson indicated to her that this incident could place her in harms way with future interactions with Dr. Grigsby. Instead of Dr. Fitzsimmons protecting Dr. Watson integrity and university employment, she becomes complicit in illegal behavior, further supporting Dr. Grigsby's white privilege in the workplace and promoted his allegations to remove Dr. Watson from university employment. **(See Exhibit 1: Termination Letter dated October 25, 2010)** However, none of his numerous complaints and unprofessional and abusive behavior were reprimanded with punitive action. Dr. Grigsby was allowed to keep his job at the University no matter the way he behaved in the work environment.

Thus, Dr. Grigsby's professional behavior became more hostile when there were employee challenges as indicated by an incident on December 2009, then another incident involving the President's survey in July 2010. He continued to escalate in his unprofessional behavior. The Plaintiff was medically advised that these interactions

were harming her health and that she should seek a more positive work environment. During summer 2010, the Plaintiff was medically scanned three times due to medical challenges.

In August 2010, Dr. Grigsby proceeded to send emails to the Plaintiff indicating that he would remove her staff without any formal conversation, followed by harassing emails during this month. To the point, a subordinate went to HR and filed a complaint about the harassing nature of the emails.

While employed at SU, the Plaintiff never had a conversation from HR regarding subordinate complaints or a response about the harassing nature of the emails sent in August 2010 from Dr. Grigsby. Unfortunately, Dr. Grigsby continued to act unprofessional in the workplace. It seems that the Plaintiff was the 'target of his anger'. He became more angered after the Plaintiff supplied the President with the detailed qualitative and quantitative results of the President's Survey in July 2010. Please note that the Plaintiff's evaluation occurred one week after she delivered the quantitative results of the President's Survey to the President's Office. (see Exhibit: Email 7/14/2010).

Thus, the university was more concerned with protecting white privilege of Dr. Grigsby and other white employees than protecting Dr. Watson's rights as an African American woman working within the PWI. There was no recourse for Dr. Watson due to the university having a very weak Human Resource Department and internal resources. (See Exhibit 1: Termination Letter dated October 25, 2010; Exhibit ____: Email dated 6/28/10)


Incident D

During Summer 2010, Dr. Watson was in her office working with her white staff. Two staff members indicated to her that Dr. Grigsby was encouraging members to file complaints against her. At this time, Dr. Watson was the only person of color on the team. Therefore, she was already dealing with racial sensitivity because most of the

staff have never worked closely with a person of color. Thus, there were many sensitivities already.

Additionally, the other African American administrator, Dr. Morton, was negatively perceived by staff people and consequently, the same perceptions were applied to Dr. Watson. Particularly, the university needed to undergo more cultural sensitivity training. Therefore, cultural sensitivity and white privilege were not appropriately addressed by the university. As such, white privilege was constantly given precedence in the workplace over minority concerns and justice.

During this summer, select staff were encouraged to file a complaint against the Plaintiff. Because these staff were troubled by Dr. Grigsby's proposition, they talked to Dr. Watson confidentially about his misconduct. Additionally, this staff told the Plaintiff that Dr. Grigsby encouraged them to file complaints against Dr. Watson, further adding to the charge of racism. (See Exhibit ____: _____)

The Plaintiff was told explicitly by two members, Paul Shoremont and Teresa Masiello, that Dr. Grigsby was encouraging disharmony and harmful team dynamics by encouraging them to file complaints against her. Thus, Dr. Grigsby should have taken the opportunity to provide professional guidance and direction regarding racial sensitivity and use team dynamics and issues as an opportunity for team building. Instead, he used white privilege as an opportunity to have documented evidence to terminate Dr. Watson from her position. Again, no workplace accommodations were granted for the Plaintiff's disability.

While working at the university, the stated complaints were never properly handled or addressed; instead, it was used for the purposes of termination and as evidence for the EEOC investigation. During the Grievance process, these complaints were used but were dismissed as the final conclusion was based on "unauthorized absence from the University on October 18, 19, and 20". (See Exhibit 2: Grievance Committee Letter dated January 26, 2011).

Incident E

After Dr. Grigsby's evaluation in July 2010, he directed the Plaintiff to report every morning to his White secretary, Ms. Hoffman, who was an hourly, non-exempt white employee at the PWI. Please note that no other exempt salaried employee was given such a charge nor was it an appropriate strategy for addressing performance issues. Why would Dr. Watson report to his secretary when the matter of the performance evaluation had not been properly addressed regarding the updated response provided by the Plaintiff?  Additionally, the Plaintiff was the only African American salaried, exempt employee within his department working at the PWI. To date, no HR representative provided guidance regarding next steps on the matter of the evaluation nor was due process employed.  (See Exhibit ____: Email dated 8/18/10; **Exhibit ___:  Performance Evaluation, 2009 and 2010,** Email dated 8/18/10; **Exhibit ___:** Email dated 8/17/10 @ 4:18 pm and 1:47 pm)

Incident F

The university was given an opportunity to respond to EEOC regarding the allegations of race and gender discrimination. The University falsified information to EEOC to prejudice a favorable outcome which obstructed an official federal investigator from carrying out his official duties and responsibilities. For one, the university did not disclose to the investigator that all of the allegations against the Plaintiff were dismissed except for "unauthorized absence from the University on October 18, 19, and 20". See Exhibit __: Grievance Committee Letter dated January 26, 2011) **(See Exhibit 1: Termination Letter dated October 25, 2010;** Exhibit 2:  Grievance Committee Letter dated January 26, 2011).

As Justin Moore writes in his  letter dated May 16, 2013:

*I have reviewed your allegations and submitted documentation. I have also reviewed all the available evidence provided by you and by the employer Shenandoah University. My determination is that there is insufficient evidence*

*showing that the employer discriminated against you based on your race, sex,*
*retaliation or violated any of the laws the Commission enforces.*

(See Exhibit ____:   Letter dated May 16, 2013)

Dr. Watson sent a letter dated May 27, 2013:

*I have been fired under false pretenses and my rights were violated! All other*
*claims were dismissed in the university's grievance process (dated January 26,*
*2011) so I am unclear why SU is stating on record the charges mentioned in your*
*letter dated May 16, 2013....*
(See Exhibit ____: Email dated May 27, 2013

When Plaintiff requested the file from EEOC, there was no official documents
from the University regarding this matter on *January 26, 2011.* Thus, EEOC made its
decision without the letter dated January 26, 2011 from the university and did not
respond to further documents submitted by the Plaintiff to address the alleged charges.
***This is a federal offense and an act of perjury for the University.*** EEOC did not
address the additional evidence provided in May 2013 due to backlog of EEOC cases.

Lastly, Dr. Grigsby and his counsel prepared the EEOC response and went to
great extents to falsify documents for the investigation as well as withheld critical
documents such as the letter dated January 26, 2011 and the complete investigation of
the September 28, 2010 incident with Teresa Masiello, to name a few.  (See Exhibit 3:
Shenandoah University Response to EEOC, dated 7/5/11)

Incident G

The university never checked its own records in the Plaintiff dismissal further
adding to charges of racial discrimination. All parties who participated in these illegal
actions were white; yet, the Plaintiff concerns were never validated nor legitimized.

Additionally, the Plaintiff was never granted opportunities to address these charges with the President and Human Resources representative and due process was not employed for the allegations used in letter dated January 26, 2011 (i.e., "unauthorized absence from the University on October 18, 19, and 20"). (See Exhibit 2: Grievance Committee Letter dated January 26, 2011). *It was after dismissal that the University conducted a Grievance process, not before. The matter of administrative discipline should have been addressed in August 2010 when the Plaintiff sent a detailed response to Dr. Grigsby's regarding his performance evaluation of her.* Yet again, the university did nothing in support of the Plaintiff on this issue.

**Incident H**

In September 28 2010, the day in question, Ms. Masiello was upset and attacked the Plaintiff in the parking lot. The other side of the incident, considerations for the Plaintiff, were not included in the university review of the incident violating her due process.

Later that day, Dr. Watson went to Ms. Masiello's office to better understand what was causing her upset. At that point, Ms. Masiello had a heated exchange with The Plaintiff of which she stated that Dr. Grigsby was trying to fire the Plaintiff. Ms. Masiello was very concerned that the Plaintiff did not believe what she was stating and had alerted her many times before this incident about the racism at SU. Ms. Masiello was concerned that the Plaintiff could lose her job.

When Dr. Grigsby entered the office, both parties were talking loudly but the matter was not resolved and changed the conversation when he entered the office. Ms. Masiello and the Plaintiff spoke often and off-campus about his racist and sexist behaviors. [Documents are available to further substantiate this incident.] At the time, the Plaintiff could not talk to anyone except her staff as many of the Senior Leaders told her when she spoke to them about various incidents, to not mention the incidents that happen to her to anyone and they would only discuss the matters 'off the record'. When

the Plaintiff went to Human Resources, more than twice and spoke with Kelly Rickerts, she was advised 'to smile and bear it'.

However, the university allowed Ms. Masiello, a white woman, to maintain her employment without reprimand for the assault in the parking lot and sided with her on the incident in the office. Additionally,  the Plaintiff's perspective on the incident were never considered, documented, or given. The university decision was one-sided and used within the termination letter on October, 2010 and led to faulty EEOC decision. (See Exhibit 1: Termination Letter dated October 25, 2010;  Exhibit __: EEOC Letter dated May 16, 2013)


### Incident I

After the supervisor, Dr. Grigsby, was able to secure the firing of Dr. Watson, he instituted two white underqualified white women into the post.  Dr. Grigsby allowed the area to be headed by white women. Since Dr. Watson's firing, there has not been another person of color hired into the position.

Once the Plaintiff's termination was finalized, the area was headed by Ms. Lamborne and Ms. Melanie Winters. Ms. Winters was given responsibility for the department with overseeing the IR and the registrar areas (former responsibilities of Dr. Watson). Ms. Winter was unqualified to do both positions. First, Ms. Winter did not hold a doctorate. Second, she was fired from her previous employer at Walden University after one year of employment. Third, one of her supposedly strong recommendations for employment to the university came from her previous supervisor who was also her boyfriend at that time of employment. Lastly, the IR department and other key university officials did not want her for the position of Registrar due to her lack and limited qualifications. (see Exhibit__: Emails dated April 6, 2009 and  Mar 29, 2010 at 2:16 PM)


**From:** Mckay, Alan
**Sent:** Tuesday, April 06, 2010 12:34 PM
**To:** Watson, Kri L.

**Subject:** Idle chatter
**Importance:** High
**Sensitivity:** Confidential

Text of my comments to Chris Bean (**for your eyes only**!)

Chris, I did not meet the first candidate so I can't comment on his qualifications. I did meet the second (Melanie Winter) and I have met on many occasions the third (Pam Lamborne). I felt that Melanie interviewed well, and possessed some of the qualities that I find essential in a registrar (knowledge of document management systems, privacy concerns, transparency) but I feel she may have a difficult time transitioning from a large online concern with multiple offices to a campus such as ours. She is knowledgeable but I am not sure how much would transfer and be of value to our "diverse" campus. Pam is qualified and knows the system. She may lack in knowledge of computer systems and different approaches due to her intimate involvement in our system over the years, but I don't think this would keep her from being an outstanding registrar. I like her quick mind, her confidence and her willingness to work with the Academic Cabinet to resolve issues before they evolve into a crisis. She is well liked by those on the Academic Cabinet and in my opinion is the best candidate for the position. For what it's worth.

## Race and Gender Discrimination

Incident A

Due to Dr. Grigsby's abusive behavior in the workplace, Dr. Watson had extensive conversations with two of the deans at the University, Dr. Allen and Dr. McKay. In these conversations Dr. Watson was informed that Dr. Grigsby behavior with them did not match the treatment she received. It was clear after these conversations that Dr Grigsby did not treat male while professionals the same way that he was treating Dr. Watson. Thus, this evidence support the allegation of gender discrimination.

Additionally, the Deans did not feel obligated to inform someone about their specific whereabouts throughout the day. One Dean mentioned that he did not keep an updated calendar on the university system and told the Plaintiff that she should be very

careful about what she posts on her calendar. Thus, the Plaintiff adhered and kept the calendar strictly to meetings and major projects with granted access to Dr. Grisby's area.

This is why Shenandoah University is responsible for the actions that were transpiring in workplace by their officials. Consequently, Dr. Grigsby's behavior encouraged racist and sexist behaviors hindered Dr. Watson's ability to carry out her professional duties at the University. He continuously use intimidation and exploitation in his role as a supervisor to gain compliance and create a hostile work environment.

Incident B

The university falsified absences within the grievance process. Of which the parties who signed the grievance response were present! The Plaintiff was physically on-campus October 20 sitting in a Shenandoah University board meeting while her staff continued to work on board documents that were to be presented during the meeting. She also gave a presentation on this day. Yet, the university claims the Plaintiff was not present.

On October 20, the Plaintiff arrived on campus early that morning and left after meeting with Dr. Morton around 5 pm or so. At the end of the day, the Plaintiff went to meet with Dr. Morton in her office at around 4 pm. On October 20 at 4:15 PM, Dr. Watson received a call from Dr. Grigsby' secretary inquiring that she should come to his office immediately to discuss the previous days' concerns. At the moment of the call, Dr. Watson was in a meeting with Dr. Morton who advised her at that time that Dr. Grigsby was on an aggressive witch hunt to get her fired from the University. Dr. Morton also stated that his behavior was racially motivated.

At 4:35 pm, Dr. Grigsby calls the Plaintiff and has a very unprofessional and abusive conversation threatening her job at the university and stating that "[she] will pay for actions" via cell phone. Dr. Grigsby made comments that he was going to be sure that she would be fired leading to him assaulting her verbally. Dr. Grigsby became more

aggressive and angered. Since Dr. Watson was in Dr. Morton's office, there was no need to be angry and respond in-kind.

Dr. Morton witnessed the phone conversation and overheard how he spoke to the Plaintiff. She understood at the moment that the behavior was inappropriate.

The Plaintiff was fired under false pretenses and her rights of due process and public policy were violated. All other claims were dismissed in the university's grievance process (dated January 26, 2011). (see Exhibit 2: Grievance Committee Letter dated January 26, 2011).

## The ADA and Disability Discrimination

Under Title VII of the Civil Rights Act of 1964, the Defendants violated the public policy by using disability discrimination against Dr. Kriesta L. Watson, the Plaintiff, a motivating reason for her discharge on October 25, 2010 and causing harm to her. The Defendants failed to provide the Plaintiff with any ADA workplace accommodations once she returned to work in August, 2009 and took actions against her disabilities for Traumatic Brain Injury (TBI) including Concussion and Bell's Palsy and nerve injuries within her back and spine (including Sciatica) by illegal termination, documented evaluations of non-attendance at work without medical accomodations, lack of FMLA notification, no workplace accommodations under ADA, no procedure for accommodation's effectiveness, no attendance accomodations. (See 42 U. S. C. § 12112(a); see also § 12111(2), § 12111(8))

The University and supervisor were notified of a car accident on June, 2009 with clear indications that injuires were sustained. No accommodations or FMLA notification were provided by the employer. (see Exhibit ___: Email dated June 22 and June 29, 2009). Nor after her accident did her supervisor offer accommodations. In a letter dated December, 2010 to Dr. Fitzsimmons, the Plaintiff noted that Dr. Grigsby did not advocate for her medical challenges nor were accommodations made regarding her

work schedule for medical appointments in accordance with ADA Title I / FMLA since her car accident.

The ADA prohibits discrimination by covered entities, including private employers, against qualified individuals with a disability. Specifically, it provides that no covered employer "shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges 478*478 of employment." 42 U. S. C. § 12112(a); see also § 12111(2) ("The term `covered entity' means an employer, employment agency, labor organization, or joint labor-management committee"). A "qualified individual with a disability" is identified as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." § 12111(8). In turn, a "disability" is defined as:

"(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;

"(B) a record of such an impairment; or

"(C) being regarded as having such an impairment." § 12102(2).


A description of the Plaintiff's physical or mental impairment includes:

a.) Bell's Palsy

Psychologically, facial paralysis can be devastating, particularly in cases that extend for a long period, or where residuals are significant. Friends, family and doctors often have no true concept of how deeply the patient's sense of self and self-esteem is affected. You will also find that they have little or no understanding of your physical discomfort, difficulty and frustration as you struggle to do seemingly simple things that they take for granted.There are many physical symptoms associated with facial paralysis, but the effects will differ between individuals. They can vary in accordance with the degree of nerve damage, and the location of the damage.

GENERAL: Muscle weakness or paralysis; Forehead wrinkles; disappear; Overall droopy appearance; Impossible or difficult to blink; Nose runs;Nose is constantly stuffed; Difficulty speaking; Difficulty eating and drinking; Sensitivity to sound (hyperacusis); Excess or reduced salivation; Facial swelling;Diminished or distorted taste; Pain in or near the ear; Drooling.

EYE RELATED: Eye closure difficult or impossible; Lack of tears;Excessive tearing;Brow droop;Tears fail to coat cornea;Lower eyelid droop;Sensitivity to light.

RESIDUAL EFFECTS: Eye appears smaller;Blink remains incomplete or infrequent;Tearing abnormalities;Asymmetrical smile;Mouth pulls up and outward; Sinus problems;Nose runs during physical exertion;Post paralytic hemifacial spasm;Hypertonic muscles;Co-contracting muscles; Synkinesis (oral/ocular well known, but can affect any muscle group);Sweating while eating or during physical exertion;Muscles become more flaccid when tired, or during minor illness; Muscles stiffen when exposed to cold, when tired, or during illness.

b.) Sciatica

Sciatica is pain, tingling, or numbness produced by an irritation of the nerve roots that lead to the sciatic nerve. The sciatic nerve is formed by the nerve roots coming out of the spinal cord into the lower back. It goes down through the buttock, then its branches extend down the back of the leg to the ankle and foot.

Symptoms of sciatica include pain that begins in your back or buttock and moves down your leg and may move into your foot. Weakness, tingling, or numbness in the leg may also occur.

RESIDUAL EFFECTS: Sitting, standing for a long time, and movements that cause the spine to flex (such as knee-to-chest exercises) may make symptoms worse.

c.) Traumatic Brain Injury (TBI)

There are various levels of TBI, including mild and moderate or severe TBI (TBI Recovery Center, 2006):

Mild TBI: Symptoms of mild TBI include headache; confusion; lightheadedness; dizziness; blurred vision or tired eyes; ringing in the ears; bad taste in the mouth; fatigue; a change in sleep patterns; mood changes; and trouble with memory,

concentration, attention, or thinking. The injury may or may not result in a brief period of unconsciousness (http://askjan.org/media/BrainInjury.html).

Moderate or Severe TBI: Symptoms of moderate to severe TBI may be similar to symptoms of mild TBI, but they may also include a headache that gets worse or does not go away, repeated vomiting or nausea, convulsions or seizures, inability to awaken from sleep, dilation of one or both pupils of the eyes, slurred speech, weakness or numbness in the arms or legs, loss of coordination, increased confusion, restlessness, or agitation (http://askjan.org/media/BrainInjury.html).

Most workplace difficulties are the result of cognitive functional limitations such as remembering, organizing, learning, and planning skills (Hirsh et al., 1996).

Other Disabilities:

In June 2009, the Plaintiff  was in car accident that left her with reoccurrences of Traumatic Brain Injury (TBI) including Bell's Palsy and nerve injuries within her back and spine (including Sciatica) which included a bedrest and ongoing physical therapy during the last 6 years. Her ability to perform her daily and occupational tasks has continuously been interrupted since 2009 with limitations for work and need for medical treatments such as physical therapies and medications. Additionally, due to her recent onset of Bell's Palsy in 2013, it has caused a reoccurrence of a vision impairment and hindered her ability to function normally with daily and occupational tasks. The patient has experienced the symptoms outlined above.

After her car accident in 2009, the patient suffered with many ailments including Bell's Palsy, severe allergic rhinitis, sinusitis, sciatica, and hypertension that were not properly treated until July 2013 (for hypertension, allergic rhinitis, sinusitis) and later, reoccurrence of Bell's Palsy in July 2014. She has been given misdiagnosis for her vision impairments for Bell's Palsy along with its associated symptoms until 2014. Therefore, the Plaintiff is currently addressing these matters with a proper treatment plan for said symptoms. Her Bell's Palsy is a result of injury to facial paralysis to nerves

5 and 7 due to cancer treatment and the recent car accident and can be further retriggered due to stress.

Since 2009, this Plaintiff continues to have chronic, stable, and ongoing illnesses and disorders. She is still undergoing many medical treatments including medications, bedrest, alternative medicine, and physical rehabilitative therapies for car accident Due to the car accident, the recent onset of Traumatic Brain Injury (TBI) including Bell's Palsy in 2013, a neurological disorder, has caused a vision impairment along with other associated and residuals symptoms outlined above have and hindered her ability to function normally with daily and occupational tasks such as sensitivities to light and sound (making it difficult to be in artificial light and sunlight), sitting, reading, writing, talking, eating, drinking, and typing. Consequently, these physical or mental impairments has resulted in difficulty managing her professional and personal affairs.

During the Plaintiff's employment, she worked with medical limitations while completing her professional responsibilities often under medical treatment [prescription drugs that should not be taken while driving], working in physical excruciating pain, constant discomfort, major stress, and the major and minor symptoms of each disability.

At time of the Plaintiff's employment, Dr. Watson was a single, African American woman mother working full-time with major disabilities, Traumatic Brain Injury (TBI) including Bell's Palsy with nerve injuries within her back and spine (including Sciatica). Her staff and supervisor were fully aware of the magnitude of the severity of the car accident after notice given in June 2009 as well as the disabilities sustained, impacting her physical, emotional, financial, and professional well-being. (see Exhibit ___: Email dated June 22 and June 29, 2009).

To establish discrimination based on a perceived disability under the version of the ADA in effect during the period at issue in this case, a plaintiff must show that he is regarded as having an impairment that "substantially limits" a major life activity. *See Sutton v.*

*United Air Lines, Inc.*, 527 U.S. 471, 489, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999),
*superseded by statute,* ADA Amendments Act of 2008, Pub.L. No. 110-325, 122 Stat.
3553 (2008).


### Violation of Fourteenth Amendment Rights and Lack of Due Process

The Plaintiff was deprived of liberty or property protected by the Fourteenth Amendment
when her due process was violated for the grounds of termination for unauthorized
absences and missed days at work. First, the letter dated 1/26/11 clearly states:

> *While there are a number of issues raised in the documentation regarding the
> employee's performance, the fact remains that unauthorized absence is grounds
> for immediate dismissal. Therefore, there is no need to provide the employee the
> opportunity to make further corrective action. In summary, the findings of the
> committee do not warrant a recommendation for reinstatement of your position
> as requested.*

Therefore, the Plaintiff was not allowed by University letter to respond to the
Defendants' allegations and charges mentioned above, resulting in an illegal act.
Second, no hearing / formal response was held that allowed the Plaintiff to address the
allegations of  unauthorized absences and missed days at work used for termination
grounds. Third, because of the lack of due process, the plaintiff was wrongfully
terminated from her position at Shenandoah University.

Background Information

Due process is the legal requirement that the state must respect all of the legal rights
that are owed to a person. Typically, "Due process" means 1) Notice, generally written,
but some courts have determined, in rare circumstances, other types of notice suffice.
Notice should provide sufficient detail to fully inform the individual of the decision or
activity that will have an effect on his/her rights or property or person. 2) right to
*grieve*(that being the right to complain or to disagree with the governmental actor/entity
that has decision making authority) and 3) the right to appeal if not satisfied with the

outcome of the grievance procedure. Due process balances the power of law of the land and protects the individual person from it. When a government harms a person without following the exact course of the law, this constitutes a due-process violation, which offends against the rule of law.

Due process has also been frequently interpreted as limiting laws and legal proceedings (see substantive due process), so that judges—instead of legislators—may define and guarantee fundamental fairness, justice, and liberty. This interpretation has proven controversial, and is analogous to the concepts of natural justice, and procedural justice used in various other jurisdictions. This interpretation of due process is sometimes expressed as a command that the government must not be unfair to the people or abuse them physically.

The Fourteenth Amendments to the United States Constitution contain a Due Process Clause. Due process deals with the administration of justice and thus the Due Process Clause acts as a safeguard from arbitrary denial of life, liberty, or property by the Government outside the sanction of law.[17]

http://en.wikipedia.org/wiki/Due_process


"While this Court has not attempted to define with exactness the liberty . . . guaranteed [by the Fourteenth Amendment], the term has received much consideration and some of the included things have been definitely stated. Without doubt, it denotes not merely freedom from bodily restraint, but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized . . . as essential to the orderly pursuit of happiness by free men."

Meyer v. Nebraska, 262 U. S. 390,  262 U. S. 399. I v. Illinois, 405 U. S. 645.

For:

"[w]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential."

*Wisconsin v. Constantineau,* 400 U. S. 433,  400 U. S. 437.  *Wieman v. Updegraff,* 344 U. S. 183,  344 U. S. 191; *Joint Anti-Fascist Refugee Committee v. McGrath,* 341 U. S. 123; *United States v. Lovett,* 328 U. S. 303,  328 U. S. 316-317; *Peters v. Hobby,* 349 U. S. 331,  349 U. S. 352 (DOUGLAS, J., concurring).  *See Cafeteria Workers v. McElroy,* 367 U. S. 886,  367 U. S. 898. In such a case, due process would accord an opportunity to refute the charge before University officials. [Footnote 12]

Similarly, in the area of public employment, the Court has held that a public college professor dismissed from an office held under tenure provisions, *Slochower v. Board of Education,* 350 U. S. 551, and college professors and staff members dismissed during the terms of their contracts, *Wieman v. Updegraff,* 344 U. S. 183, have interests in continued employment that are safeguarded by due process. Only last year, the Court held that this principle "proscribing summary dismissal from public employment without hearing or inquiry required by due process" also applied to a teacher recently hired without tenure or a formal contract, but nonetheless with a clearly implied promise of continued employment.  *Connell v. Higginbotham,* 403 U. S. 207,  403 U. S. 208.

Certain attributes of "property" interests protected by procedural due process emerge from these decisions. To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it. It is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined. It is a purpose of the constitutional right to a hearing to provide an opportunity for a person to vindicate those claims.

723 Morrissey v. Brewer, 408 U.S. 471, 481 (1982). "The requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property. When protected interests are implicated, the right to some kind of prior hearing is paramount.." Board of Regents v. Roth, 408 U.S. 564, 569-71 (1972). Developments under the Fifth Amendment's due process clause have been interchangeable. *Cf.* Arnett v. Kennedy, 416 U.S. 134 (1974).

### The Amended Complaint under 42 U.S.C. § 1983 and U.S. Const. Amend. XIV.

The Amended Complaint asserts the following claims under 42 U.S.C. § 1983 on three counts: "Violation of Liberty Rights" (Count I); "Violation of Procedural and Substantive Due Process" (Count II); and "Compensatory and Punitive Damages" (Count III). The Plaintiff asserts that defendants wrongfully terminated her employment with Shenandoah University ("SU"), for falsifying "unauthorized absence from the University on October 18, 19, and 20", 2010.

Under 42 U.S.C. § 1983, it:

> *imposes civil liability on any person acting under color of state law who deprives another person of rights and privileges secured by the Constitution and laws of the United States.*

The Fourteenth Amendment to the United States Constitution provides that no state "shall. . . deprive any person of life, liberty or property, without due process of law." U.S. Const. Amend. XIV. This clause has both substantive and procedural components. "Procedural due process imposes constraints on governmental decisions, which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause. . . . " Mathews v. Eldridge, 424 U.S. 319, 332 (1976).

In Count I of the Amended Complaint, The Plaintiff alleges that she was deprived of a liberty interest protected by the Fourteenth Amendment. Specifically, Dr. Watson contends that the defendants deprived her of her "right to pursue a calling or occupation, without just cause" leading to a wrongful termination and falsification of allegations.

Instead, "[i]t is the liberty to pursue a calling or occupation, and not the right to a specific job, that is secured by the Fourteenth Amendment." Piecknick v. Pennsylvania, 36 F.3d 1250, 1259–1260 (3d Cir. 1994)

In order to state a claim for violation of the liberty interest in her good name and reputation, "plaintiff must allege facts sufficient to show:

 (i) that '[her] superiors made charges against her that might seriously damage [her] standing and associations in [her] community or otherwise imposed on [her] a stigma or other disability that foreclosed [her] freedom to take advantage of other employment opportunities:

In this case, Dr. Watson had a wrongful termination that was based on false allegations. Additionally, the Defendants allegations prejudiced an EEOC decision without substantiation and furthered falsified facts. Thus, the wrongful termination hindered future full-time permanent employment for the Plaintiff. The University community was notified of the termination which included colleagues and key officials and external professional relationships which further caused public embarrassment professionally internally and externally to the University as well as the  Plaintiff's professional communities.

(ii) that the charges were made public by the employer:

In this case, Dr. Watson had a wrongful termination that was based on false allegations. Additionally, the Defendants allegations prejudiced an EEOC decision without substantiation and furthered falsified facts. Thus, the wrongful termination hindered future full-time permanent employment for the Plaintiff. The University community was notified of the termination which included colleagues and key officials which further caused public embarrassment professional inside the University and externally within professional communities. Thus, the Plaintiff was unable to secure full-time permanent employment in her field as a Research and Assessment expert in the local area Washington DC area.

(iii) that the charges were false:

by falsifying days not present on campus for the justification for the termination. According to the grievance process utilized to evaluate the termination, the final conclusion was based on the letter dated Jan, 2011:

"unauthorized absence from the University on October 18, 19, and 20", 2010.

According to Shenandoah University policy, an employee can be terminated for <u>missing three consecutive days from work</u>. (See Shenandoah University Staff Employment Handbook (2009), Policy 4.2, p. 19, *4.2 Attendance*). However, the plaintiff was working those three days and did not miss <u>three consecutive days from work. Yet, the university changed the conditions/grounds of the termination.</u>

(iv) that the stigmatizing remarks were made in the context of a discharge or significant demotion":

by falsifying days not present on campus for the justification for the termination. According to the grievance process utilized to evaluate the termination, the final conclusion was based on the letter dated Jan, 2011:

"unauthorized absence from the University on October 18, 19, and 20", 2012.

According to Shenandoah University policy, an employee can be terminated for missing three consecutive days from work. (See Shenandoah University Staff Employment Handbook (2009), Policy 4.2, p. 19, *4.2 Attendance*). However, the plaintiff was working those three days and did not miss three consecutive days from work. The University upheld a decision that was illegal and not substantiated. (see Echtenkamp v. Loudon Cnty. Pub. Sch., 263 F. Supp. 2d 1043, 1056 (E.D. Va. 2003) (citing Stone v. Univ. of Md. Medical Sys. Corp., 855 F.2d 167, 172 n.5 (4th Cir. 1988) (internal quotations omitted))

In Count II of the Amended Complaint, The Plaintiff alleges that she had a constitutionally protected property interest in her continued employment with the Shenandoah University, and that the defendants deprived her of that interest by terminating her without just cause or due process. To support this claim, the Plaintiff contends that she possessed a legitimate entitlement to continued employment by virtue of her length of employment (more than one year) with SU.

Further, to prevail on a procedural due process claim, "a plaintiff must have taken advantage of the processes that are available to him or her, unless those processes are unavailable or patently inadequate." Alvin v. Suzuki, 227 F.3d 107, 116 (3d Cir. 2000); see also Dusanek v. Hannon, 677 F.2d 538, 543 (7th Cir. 1982), Zinermon v. Burch, 494 U.S. 113, 126 (1990).

> "If there is a process on the books that appears to provide due process, the plaintiff cannot skip that process and use the federal courts as a means to get back what [s]he wants." Alvin, 227 F.3d at 116.

In this case, The Plaintiff underwent the university's administrative grievance procedures and process during October 2010 to January 2011; however, the Plaintiff

was denied due process for the allegations of "unauthorized absence from the University on October 18, 19, and 20", 2010 given the letter dated January 26, 2011 where it states:

> *While there are a number of issues raised in the documentation regarding the employee's performance, the fact remains that unauthorized absence is grounds for immediate dismissal. Therefore, there is no need to provide the employee the opportunity to make further corrective action. In summary, the findings of the committee do not warrant a recommendation for reinstatement of your position as requested.*

### Violations of Public Policy and Ability to Sue Defendants

Dr. Kriesta L. Watson alleges that she was discharged from employment for reasons that violate a public policy. To establish this claim, Dr. Kriesta L. Watson was:

1. That Dr. Kriesta L. Watson was employed by Shenandoah University;

2. That Shenandoah University discharged Dr. Kriesta L. Watson on October 25, 2010;

3. That Shenandoah University *violated public policies indicated in this charge* was a motivating reason for Dr. Kriesta L. Watson's discharge; and

4. That the discharge caused Dr. Kriesta L. Watson harm.

Background Information

**Virginia Supreme Court Ruling**
Recently, in *Van Buren v. Grubb*, 733 S.E. 2d 919 (Va. 2012), the Virginia Supreme Court upheld individual liability for public policy wrongful discharge claims. The court specifically ruled that a plaintiff in Virginia may pursue a common law tort claim of wrongful discharge in violation of established public policy against an individual who

was an actor in violating public policy and participated in the wrongful firing of the plaintiff.

**First Count:**
**How the Supreme Court Found Individual Liability**
In the case ( in *Van Buren v. Grubb*, 733 S.E. 2d 919 (Va. 2012),  the only question was whether Grubb could be personally liable, and in response to that question, the court answered "yes." In doing so, the court reasoned that where the wrong arises "from the unlawful actions of the actor effecting the discharge, he or she should share in liability." As the court explained:

.

*The purpose of the wrongful discharge tort — namely, the deterrence of discharge in violation of public policy — is best served if individual employees in a position of power are held personally liable for their tortuous conduct. Employer-only liability would be insufficient to deter wrongful discharges.*

Following the *Van Buren* reasoning, it imposed individual liability for supervisors and managers who participate in the wrongful conduct (see *Van Buren v. Grubb*, 733 S.E. 2d 919 (Va. 2012). Therefore, supervisors and managers need to know that their decision to terminate an employee may lead to a claim against them individually and they need to carefully consider and fully document the basis for any termination decision. Thus, the university and its employees conducted an unlawful termination on The Plaintiff by falsifying days not present on campus for the justification for the termination. The grievance process was utilized to evaluate the termination and the final conclusion was based on the letter dated Jan, 2011:

"unauthorized absence from the University on October 18, 19, and 20", 2012.

which according to Shenandoah University policy, an employee can be terminated for missing three consecutive days from work. (See Exhibit XX:  Presentation / Emails)

However, it can be argued that the Plaintiff was present for work on ALL three days. According to the following reasons:

*29 CFR 541.602 - Salary basis.*

**§541.602(a) Salary basis.**
*General rule. An employee will be considered to be paid on a "salary basis" within the meaning of these regulations if the employee regularly receives each pay period on a*

*weekly, or less frequent basis, a predetermined amount constituting all or part of the employee's compensation, which amount is not subject to reduction because of variations in the quality or quantity of the work performed. **Subject to the exceptions provided in paragraph (b) of this section, an exempt employee must receive the full salary for any week in which the employee performs any work without regard to the number of days or hours worked.** Exempt employees need not be paid for any workweek in which they perform no work. An employee is not paid on a salary basis if deductions from the employee's predetermined compensation are made for absences occasioned by the employer or by the operating requirements of the business. If the employee is ready, willing and able to work, deductions may not be made for time when work is not available.*

**Second Count:**

Thus, The Plaintiff conducted work on the 3 Days indicated (October 18-20, 2010) if the statue above (*29 CFR 541.602 - Salary basis and §541.602(a) Salary basis)* was applied. For example:

Monday -  October 18, 2010

- The Plaintiff worked with staff on Board Indicators, conducted a presentation on behalf of the university (more than 4 hours of work) (see Exhibit ___: Emails dated 10/18/2010 and 10/19/2010)

Tuesday -  October 19, 2010

- The Plaintiff worked with staff on Board Indicators, conducted a presentation on behalf of the university (more than 4 hours of work)  (see Exhibit ___: Emails dated 10/18/2010 and 10/19/2010; Exhibit ___: Presentation)

Wednesday - October 20, 2010

- Physically on-campus, The Plaintiff sat in all day Board meeting. Signed Board Meeting attendance sheets and worked with assigned staff on Research Assignments
- At 4:00 pm, The Plaintiff went to Dr. Morton's office for a meeting. Received phone call from Dr. Grigsby @ 4:35 pm threatening job at University  (see Exhibit ___: Email dated 10/21/10). The Grievance Committee and Dr. Grigsby were in attendance at the meetings with the Plaintiff on October 20, 2010. Therefore, it is

unclear why the Defendants would falsify Plaintiff's attendance at work and used it as grounds for termination.

**Third Count, according to the law:**

> "In general, a salaried employee gets paid for the full day if present at all, even for five minutes during the day. In general, "part-day" pay docking is forbidden. In some situations, the employee must miss an entire week (i.e., Sunday to Saturday) before any pay can be withheld. The theory of "salary" is that the employee receives a set amount no matter how much or little they work. The presumption is that salaried employees, due to their special sorts of work, will usually put in well over forty hours a week. Sometimes, though, they will fall short. It usually does not "even out;" over time they still tend to put in more than a forty-hour week average. If you are not required to pay the exempt employee any more in "overtime" when they exceed the forty-hour week, you may not "dock" them on those occasions they fall short. (see The §541.602(a) Salary basis.)

> General rule. An employee will be considered to be paid on a "salary basis" within the meaning of these regulations if the employee regularly receives each pay period on a weekly, or less frequent basis, a predetermined amount constituting all or part of the employee's compensation, which amount is not subject to reduction because of variations in the quality or quantity of the work performed. Subject to the exceptions provided in paragraph (b) of this section, an **exempt employee must receive the full salary for any week in which the employee performs any work without regard to the number of days or hours worked.**

> **(http://www.boardmanclark.com/reading-room/pay-and-absence-concerns-f or-exempt-employees/)**

Thus, the Plaintiff was an exempt, salaried employee who often worked more than 40 hours a week without any accommodations for her disabilities from the employer, Shenandoah University, for fear of termination and exploitation.

**Fourth Count:**

The Plaintiff was officially paid for stated days as if she was present for the time period of October 18, 19, and 20, 2010. Therefore, according to the Title 29 CFR 541.602 - Salary basis and (*§541.602(a) Salary basis*), the Plaintiff worked 3 consecutive days and was physically present at work for 1 of the stated days. Therefore, the university decision of termination was invalid given the above mentioned laws.

**Lastly**, given the case of *Van Buren v. Grubb*, 733 S.E. 2d 919 (Va. 2012), the employees working at Shenandoah University can be held liable for:

a. their role in the decision to terminate the Plaintiff on January 26, 2011 by falsifying the termination grounds leading to a wrongful discharge in violation of established public policy  (the Defendants alleges that "unauthorized absence from the University on October 18, 19, and 20", 2010) [see Shenandoah University Staff Employment Handbook (2009), p. 19:

> ***4.2 Attendance****: "An employee who is absent for three consecutive days without notifying his/her supervisor will be considered to have voluntarily terminated employment with the university and subject to dismissal".]*

(see Myers vs. Alutig International Solutions, LLC et Al. (DC. 2011), and  Title *29 CFR 541.602 - Salary basis and Title 29 USC Subsection 218c a, a2, a3, a4, and a5).*

b. the University role in committing perjury to hinder a federal investigation (EEOC) by withholding critical documents leading to faulty EEOC decision. The letter dated January 26, 2011 from the university was never provided to the  federal investigator (EEOC), Mr. Justin Moore of the Oklahoma City Area Office. This is a federal offense and an act of perjury on behalf of the University. (see 18 U.S. Code § 1621, *Title 29 USC Subsection 218c a, a2, a3, a4. and a5).*

c. The Plaintiff was officially paid for those days as she was present for the time period indicated October 18, 19, and 20, 2010. Therefore, according to the Title 29 CFR 541.602 - Salary basis (*§541.602(a) Salary basis*). As an exempt salaried employee, the Plaintiff worked those 3 consecutive days. Therefore, the termination grounds are null and void.

d. The University and its employees' roles played critical roles in violating public policy for the Plaintiff.

(Including violating due process and redress.  See email dated October 26, 2010:

---------- Forwarded message ----------

From: **Kriesta Watson** <kriwatson@gmail.com>
Date: Tue, Oct 26, 2010 at 8:52 AM
Subject: Important Points for the Lawsuit
To: gwen@keytugglelaw.com

I scheduled a meeting with HR on Friday for this Monday, 10/25, @ 11 am to discuss work place issues. I also established a meeting with the President for Monday, 10/25, @ 3pm to discuss the matter. Later, on Friday, he [Dr. Grigsby] scheduled a meeting with me on Friday, 10/22, at 3:30 pm for Monday, 10/25, at 10 am. Thus, when I arrived at work, I never had my meetings with HR or the President nor was there discussion about the specifics on these documents or the firing or how this decision. I was never provided any evidence of poor work products or poor performance or dates and times of absences from work.

I have a question about retaliation because of an abusive conversation held with me on last Wednesday, October 20th @ 4:35 pm with Dr. Grigsby. I have kept records of other similar incidents throughout my time there and can provide the requested documentation from abusive conversations held with me.)

(including citing 3 allegations dated October 25, 2010 based on Shenandoah University Staff Employment Handbook (2009) Policies 9.1, 9.2, and 9.4 to 1 single allegation cited January 26, 2011 based on Shenandoah University Staff Employment Handbook (2009) Policy 4.2 which was used in the final termination. In the final allegation and termination decision, the Plaintiff was not allowed to address the decision. The Grievance Committee stated in the letter dated January 26, 2011:

> *While there are a number of Issues or events raised in the documentation that are open to interpretation,* **the committee identified the critical issue regarding termination as the violation of the university's stated policy 4.2 Attendance.** *This policy states that an employee who is absent for three consecutive days without notifying his/her supervisor will be considered to have voluntarily terminated employment with the university arid subject to dismissal. There appears to be clear documentation of your unauthorized absence from the university on October 18,19, and 20, 2010......While there are a number of issues raised in the documentation regarding the employee's performance, the fact remains that unauthorized absence is grounds for immediate dismissal.* **Therefore, there is no need to provide the employee the opportunity to make further corrective action. In summary, the findings of the committee do not warrant a recommendation for reinstatement of your position as requested.**

Thus, the Shenandoah University and its select employees can be added as defendants because they participated in a wrongful act and violated a status of public importance / public policy for the Plaintiff by:

a.) falsifying the terms for the Plaintiff's termination which resulted in employment termination of the Plaintiff.

b.) Enforcing Staff Employment policies on the Plaintiff that violated Federal Statues (see Title *29 CFR 541.602 - Salary basis and 29 U.S. Code § 218c,* **Title VII** *of the Civil Rights Act of 1964, 42 U.S.C. 2000e et seq., and violations of Labor Laws).* Based on the Staff Employment Handbook (2009):

> **4.2 Attendance**
> *"An employee who is absent for three consecutive days without notifying his/her supervisor will be considered to have voluntarily terminated employment with the university and subject to dismissal" (p. 19)*

c.) Changing the grounds for the Plaintiff's termination without due process and redress. The allegations dated October 25, 2010 for 3 allegations based on Shenandoah University Staff Employment Handbook (2009) Policies 9.1 Work Schedule, 9.2 Departmental Procedures , and 9.4 Professionalism (p. 48) to 1 single allegation dated January 26, 2011 based on Shenandoah University Staff Employment Handbook (2009)

Policy 4.2 which was used in the final termination. In the final allegation and termination decision, the Plaintiff was not allowed to address the decision.

d.) The Grievance Committee was not adequately trained in employment law which caused further injury and violation of public policy to Plaintiff.

Furthermore, the court specifically ruled that a plaintiff in Virginia may pursue a common law tort claim of wrongful discharge in violation of established public policy against an individual who was an actor in violating public policy and participated in the wrongful firing of the plaintiff.

Final Comment:

Therefore, I request the court to add the following Defendants based on their role in violation of public policy:

- Tracey Fitzsimmon - authorized termination and participated in unfair grievance process
- Byron Grigsby - authorized and recommended termination and unfair participated in grievance process
- Calvin Allen - recommended termination and  unfair participated in grievance process
- Marie Landes - recommended termination and  unfair participated in grievance process
- Board of Trustees of Shenandoah University -  authorized termination and grievance process

### Remedies

Compensatory and punitive damages may be awarded in cases involving intentional discrimination based on a person's race, color, national origin, sex (including pregnancy), religion, disability, or genetic information.

Compensatory damages pay victims for out-of-pocket expenses caused by the discrimination (such as costs associated with a job search or medical expenses) and compensate them for any emotional harm suffered (such as mental anguish, inconvenience, or loss of enjoyment of life).

The law places caps on the sum of compensatory and punitive damages for which an employer may be liable. The caps are based on the size of the employer's workforce:

Responder is an employer of more than 100 employees. Therefore, responder is subject to punitive damages more than $50,000.

Charging Party is requesting the following remedies:

1) Equitable relief, which is relief intended to restore Charging Party whole again

2) Back pay to compensate for lost earnings,

3) Front pay to compensate for a pay differential resulting from discrimination

4) Injunctive relief to correct Respondent's discriminatory practices

5) Punitive Damages to the maximum extent of the law

6) Reinstatement as a with full benefits as Director of Institutional Research and Assessment / Assistant Professor of Education with retroactive benefits (salary with interest and health and retirement benefits), and more importantly

7) The Shenandoah University and its officials and above, be required to participate in Sensitivity and Diversity Training

8) Legal fees and related costs for legal assistance and materials

9) Removal of bias performance evaluations from my permanent personnel file along with corrections to the erroneous grounds for the termination and Grievance letters.

## Conclusion

Given the exhaustive list of incidents provided in this comprehensive complaint, the university practiced discrimination in the protected classes of race, gender, and

disability as well as created a hostile work environment. which contribute to a negative impact on the Plaintiff's health and wellness, further hindering the Plaintiff ability to overcome the immediate and current disability.

*This is direct example of racism and white privilege. The university did not act as if I had rights nor was a proper investigation conducted. However, the university collected and used the information from one side of the incident to validate their termination.*

Due to white privilege which was prevalent in the workplace, the University allowed key SU employees to harm Dr. Watson by not following due process as making faulty and wrong conclusions that lead to employment termination.

At a predominantly white institution, the white employees may not understand the importance of white privilege in the workplace. They may not see their privileges as a results of promotion, performance, special accommodations in the workplace.

In this case, the University continuously allowed Dr. Watson rights and public policies to be violated as an African American woman employee. When the Plaintiff went to other key Senior officials at the University for professional guidance, she was told not to report it to human resources and to keep her mouth shut as the situation will work itself out. However, the situation worked itself out in the way that the Plaintiff lost her employment; further hindering her professional, physical, emotional, financial, and academic wellness.

Because of white privilege and the motivation to terminate an African American woman, the university did not feel obligated to protect the Plaintiff rights in the workplace as a black woman; instead, they allowed the white members of the community rights to be more valuable than the Plaintiff as an institutional employee. This is why the Plaintiff was not granted accommodations for disability or considerations regarding the falsification of her termination.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## CERTIFICATE OF SERVICE

I hereby certify that on _____ 1/14/15 _____, a true and correct copy of
the foregoing instrument has been forwarded by first class mail to counsel of
record.

_____ (Sign your name above)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

1/14/15